**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

In re                              ) Case No.  17-11028-B-11
                                   )
PACE DIVERSIFIED CORPORATION,      )
                                   )
                Debtor.            )
_____)
                                   )
PACE DIVERSIFIED CORPORATION,      ) Adv. Proc. #18-01006-B
a California corporation;          )
DARK ROCK, LLC, a California       )
limited liability company,         )
                                   )
                Plaintiffs,        )
                                   )
v.                                 )
                                   )
MACPHERSON OIL COMPANY,            )
a California corporation;          )
SANDRA BRAUCHT, an individual,     )
                                   )
                Defendants.        )
_____)
                                   )
MACPHERSON OIL COMPANY, a          )
California corporation,            )
                                   )
                Counter-Plaintiff, )
                                   )
v.                                 )
                                   )
PACE DIVERSIFIED CORPORATION,      )
A California corporation;          )
DARK ROCK, LLC, a California       )
limited liability company,         )
                                   )
                Counter-Defendants.)
_____)


**MEMORANDUM RULING ON PRIORITY OF CONTESTED INTERESTS
AND ORDER REGARDNG FURTHER PROCEEDINGS**


**INTRODUCTION**

Upon his death in 1929, Louis V. Olcese was described by a

Central Valley newspaper as "one of the wealthiest men in Kern

1

County."[1] He was the son of Italian immigrants and moved to Bakersfield from Northern California. He founded the Ardizzi-Olcese Bank.[2] His wealth grew as he bought acres of land, which he ranched.[3] Among the acreage he owned was a portion of the Round Mountain Oilfield in Kern County. This case is about those entitled to lease or own Olcese's interest in a section of that field.

Two competing oil companies (one of which is a reorganized chapter 11 debtor) claim priority in the mineral interests in a portion of the section. Applying the California recording statutes to the facts in this case, the court determines that both oil companies have priorities to different interests. The specifics are set forth below.[4]

**I**

**A.**

The Round Mountain Oilfield is located northeast of Bakersfield, in Kern County, California. One of the sections in that oil field is Section 17. Stipulated Fact ("SF") ¶ 5.[5] The section contains 640 acres. The oil and gas rights in the

///

---

[1] Jack Hardisty, *The Olcese House: A Home with a lot of Stories*, The Bakersfield Californian (Sept. 9, 2016) https://www.bakersfield.com/archives/the-olcese-house-a-home-with-a-lot-of-stories/article_f56f4083-835f-5d75-891b-437a69e38b25.html (visited Dec. 1, 2022).

[2] *Id.*

[3] *Id.*

[4] The following are the court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52 (Federal Rule of Bankruptcy Procedure 7052). Should it be determined that a factual finding is a conclusion of law, the court adopts the same as a conclusion of law, and vice-versa.

[5] The Stipulated Facts are set forth in Article III of the Joint Pre-Trial Order ("JPO") at 2:10-16:5, Doc. #208.

northwest, northeast, and southeast quarters of Section 17 are the subject of this action.[6]

Reorganized debtor Pace Diversified Corporation ("Pace Diversified") and its affiliate, Dark Rock, LLC ("Dark Rock"), claim they hold 100% of the oil and gas rights in the relevant quarters of Section 17.[7] Pace Diversified is in the business of producing oil, which it then sells. All of Pace Diversified's oil operations are in Kern County. Trial Tr. ("TT") 33:2-12, Docs. ##245-46. Dark Rock is affiliated with Pace Diversified because the president of Pace Diversified, Duane Roach, is the managing member of Dark Rock.[8] TT 34:25-27.

It is undisputed that early in the twentieth century, the mineral rights to Section 17 were owned by Louis V. Olcese. SF ¶ 15. Upon his death, his 100% mineral interest in Section 17 was split between eight heirs, and subsequently divided further between many descendants. SF ¶ 16. Five interests are disputed here.

Before July 1, 1999, Pace Diversified's predecessor, Pace Western Corporation ("Pace Western"), was provided with a list of heirs of Louis Olcese. TT 35:27-36:26, 37:20-23. It is undisputed that Pace Western Corporation leased a portion of the northeast quarter of Section 17 from the Olcese heirs. Joint Ex. ("JX") Y; TT 36:11-20. In 2001, Pace Western Corporation assigned the original Olcese lease to Pace and the assignment

---

[6] The oil and gas rights of the southwest quarter of Section 17 are not in dispute.

[7] Pace Diversified Corporation and Dark Rock, LLC, will collectively be referred to as "Pace" unless otherwise indicated.

[8] Dark Rock does not engage in oil production, but rather has assets consisting of a rental house and certain oil royalties.

was recorded in January 2002. JX Z; SF ¶¶ 19-20. Two addenda were later added. *Id.* ¶¶ 19-21; TT 44:7-25; JX EE. Through the addenda, Pace claims its oil and gas lease interests expanded to the rest of Section 17. TT 43:3-20; SF ¶¶ 19-21; JPO 1:16-19.

MacPherson Oil Company ("MOC") also produces oil from the Round Mountain Oilfield. MOC and Pace have an adversarial history. MOC sued Pace in 2011 concerning Pace's oil operation within Section 17. TT 46:22-48:4, 48:25-27. In November 2015, Pace sued MOC in the Kern County Superior Court, Case No. BCV-15-101562-DRL ("KC Action"). SF ¶ 7. In this second suit, Pace claimed that MOC "watered out" two Pace production wells located in Section 17 and alleged MOC's water disposal from MOC's nearby oil operations caused the damage. *Id.* ¶ 8; Defs.' Ex. ("DX") 752. MOC contended Pace in fact mis-drilled its wells in wrong locations which in turn caused the wells to produce only water. SF ¶ 9. Pace maintained throughout the KC Action that it was the mineral lease holder and operator of the Olcese lease. DX 752.

MOC, wanting to mitigate its damage exposure, retained an independent oil and gas brokerage firm, Maverick Petroleum, Inc. ("Maverick"), to assist in conducting a title review to determine the extent of Pace's interests in Section 17. TT 136:26-138:18. MOC surmised that Pace had not leased approximately 20% of the mineral rights in Section 17. *Id.* at 137:19-22. MOC's counsel gave Cliff Clement (the then vice-president of Land and Real Estate for MOC) a list of Section 17 interests that MOC should acquire to mitigate its damages in the KC Action. TT 161:10-162:28. The Maverick employee charged with acquiring most of the alleged unleased interests was Yvonne

Hicks. TT 229:22-230:5, 230:20-22. Both Cliff Clement and Yvonne Hicks are "landmen."[9] Neither Cliff Clement nor Yvonne Hicks independently reviewed any title documents before attempting to acquire the alleged unleased interests. TT 162:13-15, 162:25-28, 163:21-26, 230:13-19.

MOC's efforts began in October 2016. Cliff Clement and Yvonne Hicks set about to either lease or purchase the alleged "unleased" mineral interests and mineral rights in Section 17.

Concurrently, MOC filed a cross-complaint against Pace in the KC Action alleging that Pace had not leased 100% of the mineral rights in Section 17. SF ¶ 7. The interests in dispute are identified by the parties and the court as (1) the Black interest, (2) the Braucht or Cramer interest, (3) the Solomon interest, (4) the Stewart interest, and (5) the Stanford or Simonson interest. More about those interests later.

Meanwhile, on March 23, 2017, Pace Diversified filed a Chapter 11 Petition. Bankr. Case No. 17-11028 ("Bankr.") Doc. #1. Pace Diversified confirmed the *Second Amended Plan of Reorganization* (the "Plan") on December 28, 2017. Bankr. Docs. ##398-99. Under the Plan, Pace Diversified is continuing to operate all of its mineral interests including those in Section 17. The Plan also authorizes Pace Diversified to pursue all necessary litigation to enforce its rights. Before the Plan was confirmed, Pace Diversified and MOC settled their differences over Pace's claimed damage to its oil operations on

---

[9] Landman is a job title for a land management professional. They are ordinarily part of a team who negotiates and interacts with landowners to acquire mineral lease agreements. *What is a Landman*, American Association of Professional Landmen, https://www.landman.org/about/who-we-are/what-is-a-landman (visited Dec. 1, 2022).

Section 17. The settlement was approved by the Bankruptcy Court. Bankr. Doc. #245. The settlement provides that both MOC and Pace retain their ownership interests (whatever they may be) in Section 17. *Id.*

This adversary proceeding was filed February 5, 2018. Compl., Doc. #1. Pace Diversified and Dark Rock ask for a declaration that their disputed rights and claims to the mineral interests are superior to any rights or claims of defendant and counterclaimant MOC. *Id.* MOC seeks a declaration that it holds superior legal title to the mineral interests in dispute. Answer, Doc. 7. MOC also claims it is a co-tenant of Pace or Dark Rock with respect to the mineral interests and is entitled to an accounting as to the oil that has been produced from the subject property.[10] JPO 1:11-22; 92:21-94:2. The court has bifurcated the issue of any accounting between Pace and/or Dark Rock and MOC for a second phase of trial. JPO 1:23-26. This ruling only relates to priorities of interests. This ruling does not order an accounting or find that any party owes the other royalties or other damages.

**B.**

Pace contends that it acquired each of the five interests disputed here before MOC acquired their interests. Pace also claims that its interests precede any MOC interests because recorded documents in the official records gave direct or indirect notice of Pace's interests. MOC was obligated to inquire about the state of title to the disputed interests, says

---

[10] Sandra Braucht did not file an Answer, but her interest was leased to Maverick on or about November 21, 2016, which was then assigned to MOC. Joint Stmt. of Undisputed Facts ¶¶ 63-64, Doc. #96.

Pace, based upon the facts and circumstances. Pace contends that if a proper inquiry had been made, MOC would have known of the unrecorded deeds or interests by which Pace claims priority. Alternatively, Pace claims that MOC, upon proper inquiry, would have learned that the instruments Pace did record were intended to describe some or all of the disputed interests MOC now claims.

Pace asserts that, in 2013, it transferred some of the disputed interests to its affiliate, Dark Rock. This is undisputed. SF ¶¶ 33, 48.

MOC contends that its acquisition of the disputed mineral interests has priority over those claimed by Pace because Pace did not record any instruments in the official records showing Pace's ownership or other interests in those acquired by MOC. Accordingly, MOC contends its acquired interests have priority over Pace's interests.

There is no dispute that Pace either owns or has leased most of the interests in Section 17. The dispute involved here relates to approximately 20% of the interests Pace claims.

**C.**

The United States District Court for the Eastern District of California has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) in that this is a civil proceeding arising in and related to a case under Title 11 of the United States Code. The District Court has referred this matter to this court pursuant to 28 U.S.C. § 157(a). The complaint in this adversary proceeding is a "core" proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (O). The parties have

all consented to the entry of a final order or judgment in this matter by this court if the claims alleged are "non-core." JPO 2:8-9.

## II

Property rights are governed by state law. *Butner v. United States,* 440 U.S. 48, 54-55, 99 S. Ct. 914, 917-18 (1979), *superseded in part on other grounds*. To determine whether a transfer has occurred, a bankruptcy court looks at state law. *Finalco, Inc. v. Roosevelt (In re Roosevelt)*, 176 B.R. 534, 537 (B.A.P. 9th Cir. 1985), *aff'd*, 87 F.3d 311 (9th Cir. 1996), *overruled in part by Murray v. Bammer (In re Bammer)*, 131 F.3d 788 (9th Cir. 1997).

The royalty interest in an oil lease reserved by a landowner is an interest in real property. *La Laguna Ranch Co. v. Dodge,* 18 Cal. 2d 132, 135, 114 P.2d 351, 353 (1941). So is an oil lease. *See*, *Payne v. Callahan,* 37 Cal. App. 2d 503, 509, 99 P.2d 1050, 1052 (1940) (oil lease of indefinite duration). The interests here are those of oil leases encumbering portions of Section 17 in the Round Mountain Oilfield. Priority of interests between Pace and MOC are questions of property rights, which under *Butner* are determined by state law.

A discussion of state law follows.

### A.

Under California law, a conveyance of real property must be "recorded in order to be valid against a subsequent purchaser of the same property." *Robertson v. Peters (In re Weisman)* 5 F.3d 417, 420 (9th Cir. 1993); Cal. Civ. Code ("CC") § 1214. Thus, "a

bona fide purchaser who records prevails over a prior transferee who failed to record." *In re Probasco*, 839 F.2d 1352, 1353 (9th Cir. 1988). However, CC § 1217 provides: "[a]n unrecorded instrument is valid as between the parties thereto and those who have notice thereof."

The rights of a bona fide purchaser are defined by state law. *In re Tleel*, 876 F.2d 769, 772 (9th Cir. 1989). To be a bona fide purchaser generally requires good faith, payment of valuable consideration, no notice of another party's interest in the property, and duly recording that person's intertest. *Gates Rubber Co. v. Ulman*, 214 Cal. App. 3d 356, 364, 262 Cal. Rptr. 630, 635 (1989); *Schoenmann v. De Leon (In re Whiting)*, 311 B.R. 539 (Bankr. N.D. Cal. 2004). Good faith requires that the buyer have neither knowledge nor notice of the competing claim. *Triple A Mgmt. Co. v. Frisone*, 69 Cal. App. 4th 520, 530, 81 Cal. Rptr. 2d 669, 675-76 (1999).

"Notice" with respect to bona fide purchaser status in California generally breaks down into three types: actual, constructive, and inquiry.[11] Actual notice is obvious—the subsequent purchaser knows of the prior interest. But actual notice may attach if a subsequent purchaser or encumbrancer is told of the prior interest, hears it discussed, or sees the document referring to the interest. *See*, *Beverly Hills Nat'l Bank & Tr. Co. v. Seres*, 76 Cal. App. 2d 255, 172 P.2d 894 (1946). For example, a prudent purchaser is charged with knowledge of information that a reasonable inspection of the

---

[11] The Ninth Circuit treats inquiry and constructive notice as related, if not identical, doctrines. *In re Prof'l Inv. Props.*, 955 F.2d 623, 628 (9th Cir. 1992); *Weisman*, 5 F.3d at 420.

property would have revealed. *Weisman*, 5 F.3d at 420. "Actual notice is defined as express information of a fact while constructive notice is that which is imputed by law." *In re Marriage of Cloney*, 91 Cal. App. 4th 429, 436, 110 Cal. Rptr. 615, 621 (2001), quoting CC § 18 (quotations omitted).

Constructive notice of a lien or other interest in property arises from the proper recording of that interest. *Cloney*, 91 Cal. App. 4th at 437, 110 Cal. Rptr. at 621. The law "conclusively presumes that a party acquiring property has notice of the contents of a properly recorded document affecting the property." *Hochstein v. Romero*, 219 Cal. App. 3d 447, 452, 268 Cal. Rptr. 202, 204 (1990); *see*, CC § 1213 (recorded conveyance of real property provides constructive notice to subsequent purchasers). A bona fide purchaser of real property has constructive notice of only those matters that could be located by a diligent title search. *Dyer v. Martinez*, 147 Cal. App. 4th 1240, 1242, 54 Cal. Rptr. 3d 907, 908 (2007). Absent suspicious or other circumstances warranting a reasonable investigation, a recorded document does not put a potential purchaser on notice of the content of a referenced unrecorded document. *Am. Med. Int'l, Inc. v. Feller*, 59 Cal. App. 3d 1008, 1020, 131 Cal. Rptr. 270, 278 (1976); *Gates Rubber Co.*, 214 Cal. App. 3d at 365, 262 Cal. Rptr. at 635-36; CC § 19 ("Every person who has actual notice of circumstances sufficient to put a prudent person upon inquiry as to a particular fact has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he or she might have learned that fact.").

This leads to the third type of notice: inquiry notice. A subsequent purchaser may also have constructive notice of a fact affecting his or her property rights when the purchaser "has knowledge of circumstances which, upon reasonable inquiry, would lead to that particular fact." *Cloney*, 91 Cal. App. 4th at 437, 110 Cal. Rptr. at 621. "If the purchaser neglects to prosecute such inquiry diligently he may not be awarded the standing of a *bona fide* purchaser." *Asisten v. Underwood*, 183 Cal. App. 2d 304, 310, 7 Cal. Rptr. 84, 87 (1960), quoting *Rabbit v. Atkinson*, 44 Cal. App. 2d 752, 757, 113 P.2d 14, 17 (1941) (quotation omitted).

Although a purchaser may rely on the recorded chain of title, the purchaser may not "ignore information that comes to him from *outside* the recorded chain of title, to the extent such information puts him on notice of information that reasonably brings into question the state of title reflected in the recorded chain of title." *Triple A Mgmt.*, 69 Cal. App. 4th at 531, 81 Cal. Rptr. 2d at 676 (emphasis in original). But the fact that a potential subsequent interest holder searches and evaluates the record through an escrow or title agent does not in any manner diminish his right to rely on the state of record title. *Id.*; *see*, *First Fid. Thrift & Loan Ass'n. v. All. Bank*, 60 Cal. App. 4th 1433, 1445, 71 Cal. Rptr. 2d 295, 303 (1998) (lender's inquiry to borrower's bank to determine competing loan status instead of directly to competing lender deemed sufficient).

Subsequent purchasers can rely on the face of properly recorded documents subject to very limited exceptions. Reliance

on the recorded documents alone may not be appropriate if the document is so ambiguous on its face as to leave room for a reasonable difference of opinion as to what was granted *Buehler v. Or.-Washington Plywood Corp.*, 17 Cal. 3d 520, 529, 551 P.2d 1226, 1232 (1976). Alternatively, the recorded document must contain qualifying words sufficient to cast reasonable doubt on what was intended to be granted. If either circumstance exists, priority may be up to the courts. *Id.*

California law gives some guidance as to the qualities of a "prudent purchaser." It is someone shrewd in the management of practical affairs and whose conduct is marked by wisdom, judiciousness, or circumspection. *See*, *Probasco*, 839 F.2d at 1356. Such a purchaser will be charged with knowledge of (1) the nature of the property; (2) its current use; (3) the identities of the persons occupying it; (4) the relationship among them; and (5) the relationship between those in possession and the person whose purported interest in the property the purchaser intended to acquire. *Id.*

A prospective purchaser is on notice to inquire if there is clear and open possession of real property by someone other than the party on title. This constitutes constructive notice to the subsequent purchaser, requiring such purchaser to inquire into the possessor's interest. *Id.* at 1354. But "there is no duty to inquire upon a subsequent purchaser regarding any unknown claims or interest by a person in possession of real property when the occupants' possession is consistent with the record title." *Weisman*, 5 F.3d at 421.

///

We next briefly explore whether the issues facing the court in this matter are questions of fact or law.

**B.**

The determination of whether a party is a good faith purchaser . . . ordinarily is a question of fact. *Triple A Mgmt.*, 69 Cal. App. 4th at 536, 81 Cal. Rptr. 2d at 679-80. At the same time "whether a party has notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, and whether by prosecuting such inquiry he might have learned such fact, are themselves questions of fact to be determined by the jury or the trial court." *Hobart v. Hobart Estate Co.*, 26 Cal. 2d 412, 440, 159 P.2d 958, 974 (1945) (cleaned up); *see also*, *Probasco,* 839 F.2d at 1355.

These factual questions raise the issue of who has the burden of proof. The general rule places the burden of proof upon a person claiming bona fide purchaser status to present evidence that he or she acquired an interest in the property without notice of the prior interest. *Gates Rubber Co.*, 214 Cal. App. 3d at 366 n.6, 262 Cal. Rptr. at 636 n.6; *First Fid. Thrift & Loan Ass'n.*, 60 Cal. App. 4th at 1442, 71 Cal. Rptr. 2d at 301. But a party claiming an equitable interest has the burden of proof to show due and sufficient notice to the defendant of matters outside the record title. *Kabayan v. Yepremian*, 190 B.R. 389, 395 (C.D. Cal. 1995), quoting *Kowalsky v. Kimberlin*, 173 Cal. 506, 510-11, 160 P. 673, 674 (1916). To be sufficient, notice must be precise and complete enough to put the defendant upon his guard. *Id.; see also*, *Weisman* 5 F.3d at 421 ("whether the circumstances are sufficient to require inquiry as to

another's interest in property for the purposes of [CC §] 19 is a question of fact, even where there is not dispute over the historical facts.").

With these concepts in mind, we analyze the five disputed interests involved here.

**III**

**A.**

The Black interest is 1.141666% of the oil and gas rights of Section 17 that were conveyed to Madelon E. Black in 1986. SF ¶ 76. Pace Diversified obtained the Black interest and assigned its interest to Dark Rock. JX KK.

The parties agree that the dispute relates to the succession of Madelon Black's interest. JPO 53:13-18, 54:15-55:16; SF ¶ 14. Her interest was a percentage throughout Section 17. JX T. Madelon Black signed the original Olcese lease dated July 1, 1999. JX Y. Madelon Black also signed the 2009 addendum. Pls.' Ex. ("PX") 25. But the addendum was not recorded. Pace paid royalties based upon Madelon Black's interest. TT 40:21-24. Pace makes two claims to priority to the Black interest.

First, Pace claims that MOC had actual and constructive notice of their prior interest because the original Olcese lease was recorded in the Official Records of Kern County. JPO 33:10-34:17. In addition, Pace claims that even though the addendum was not recorded, MOC failed to make a diligent inquiry before acquiring the Black interest from Maverick between August and November of 2017. *Id.* at 34:18-22. Pace argues that CC § 19 and related authorities support that, if anything, the extent of the

Black heirs' interests was ambiguous. MOC should not interpret any ambiguity in the record in its favor. Pace claims that MOC could not rely on record title because Mr. Clement and Ms. Hicks did not conduct due diligence by checking original documents.

Second, Pace claims that after Madelon Black's death in April 2007, her successor, Ralph Black, signed a Deed of Mineral Interests in September 2007 and recorded on March 6, 2012. JX II, LL; SF ¶ 80. Pace was permitted to rely upon Ralph Black's authority to act on behalf of Madelon Black's heirs under Cal. Prob. Code ("PC") §§ 18100 and 18102.

Pace also claims that the assignment of the interest to Dark Rock referenced the Deed of Mineral Interest and MOC was therefor on notice. JPO 34:16-17; JX II.

In response, MOC claims three bases to priority. First, Ms. Hicks of Maverick entered into the leases with heirs Daniel, Karen, and Andrew Black, and Barbara Ann Cross recorded in August of 2017. JX XX, YY, ZZ, BBB; SF ¶ 83. MOC claims that no one told Ms. Hicks they were receiving royalties from Pace or that they sold their interests. TT 221:27-222:12.

Second, MOC claims that, since the addendum signed by Madelon Black in 2009 was never recorded, they were not on inquiry notice of the addendum signed by Madelon Black. JPO 42:26-43:3.

Third, MOC claims that the Deed of Mineral Interests signed by Ralph Black was only in his individual capacity and not as a trustee or other successor to Madelon Black. *Id.* at 43:3-7.

The court agrees with MOC regarding the Black interest. ///

1　　　　First, Madelon Black's signature on the 2009 lease addendum

2　was unrecorded. JX EE. There is no evidence of MOC knowingly

3　ignoring what was in the records. Ms. Hicks testified she had no

4　contrary knowledge from the Black heirs. TT 221:27-222:12.

5　　　　Second, the Deed of Mineral Interests signed by Ralph Black

6　was as to his individual interest and as to his sole and

7　separate property. There was no ambiguity in that deed nor

8　qualifying language. *See*, *Buhler*, 17 Cal. 3d at 529, 551 P.2d at

9　1232. The assignment to Dark Rock references the Deed of Mineral

10　Interests which as mentioned is unambiguous. JX KK.

11　　　　Third, the allegation contained in Pace's complaint in the

12　KC Action about Pace's interests in Section 17 is far too

13　general to impart a duty of inquiry upon MOC. Indeed, claims of

14　equitable interests in connection with pending litigation

15　generally have to be the subject of a lis pendens. *See*, *Tleel*,

16　876 F.2d at 772. The court has not been directed to a lis

17　pendens being recorded in the KC Action. Nevertheless, it is

18　beyond dispute that MOC did investigate the state of title of

19　mineral interests in Section 17 while the KC Action was pending.

20　Thus, it is not MOC lack of diligence that is the issue. Rather,

21　what specifically did MOC fail to consider when researching the

22　mineral interests? Pace does not say other than it had an

23　unrecorded lease.

24　　　　Fourth, Mr. Clement's and Ms. Hicks' reliance on the "list"

25　prepared by MOC's counsel does not evidence a lack of due

26　diligence. Subsequent purchasers may rely on record title even

27　if they use agents for searches. *Triple A Mgmt.*, 69 Cal. App.

28　4th at 530, 81 Cal. Rptr. 2d at 675. Here, Ralph Black signed

16

the Deed of Mineral Interest "dealing with his sole and separate property" in September 2007. The deed was not recorded until March 2012. JX II. Less than a year later, on May 3, 2013, the assignment of Mineral and Royalty Interests from Pace Diversified to Dark Rock is recorded. JX KK. A year later, in June 2014, there is recorded the Affidavit of Real Property of Small Value, which Ralph Black signed as trustee and identifies the Black heirs. JX LL, MM. Pace's Deed of Mineral Interest was signed by Ralph Black in his individual capacity even though he was apparently a trustee at the time.

Fifth, the Probate Code sections Pace relies upon do not change the result. PC § 18100 protects a third party dealing with a trustee who may be exceeding his powers and pays valuable consideration without actual knowledge the trustee is exceeding or improperly exercising powers. PC § 18102 provides that if a third party is protected if the party pays valuable consideration in good faith and enters into a transaction with a trustee, who is no longer a trustee. Here, Duane Roach "understood" he was dealing with Ralph Black as "owner" of Madelon Black's interest but the recorded Deed of Mineral Interest says otherwise. JX MM. This is not a situation where Ralph Black may have exceeded his power when Pace purportedly acquired the interest. Even if Ralph Black had the power (a fact not persuasively proven except by the Affidavit of Real Property of Minimal Value), nothing in the Probate Code, the authority presented by the parties, or the caselaw reviewed by the court

///

///

suggest that these Probate Code provisions preempt California's recording laws.[12]

In sum, the court finds Maverick leased the Black interest for consideration and did not have notice of Pace's prior unrecorded lease addendum with Madelon E. Black or without notice of the purchase of the Section 17 mineral interests from Ralph M. Black, executor of the estate of Madelon Black. Maverick assigned the leases to MOC and MOC holds legal title to the Black interest.

**B.**

The Braucht interest is 0.583333% of the oil and gas rights in Section 17. SF ¶ 86. But the interest in dispute is that of Braucht heir, Rebecca Cramer, who had a 0.194444% interest in Section 17. The interest excludes the east half of the southeast quarter of Section 17. JX GGG.

Pace claims a prior interest in Rebecca Cramer's portion of the "Braucht interest" on two grounds. First, Pace claims that Stephen B. Braucht (Rebecca Cramer's father) signed the Pace-Olcese Addendum and the signature was recorded. Thereafter, Stephen Braucht and his spouse, Sandra Braucht, accepted royalty payments. Even after Stephen Braucht's death in July 2010, Sandra Braucht accepted royalties. SF ¶ 91; JPO 39:3-19. Pace asserts that neither Mr. Clement nor Ms. Hicks independently verified the state of title.[13] Pace goes on to say that Ms. Hicks

///

///

---

[12] Pace did pay royalties to the Black heirs. That is consistent with Pace honoring its agreement even though it was unrecorded under CC § 1217.
[13] The court has already discussed that matter above.

learned from Sandra F. Braucht that she believed she was
receiving royalties.[14] PX 56.

The second basis for Pace's claim to priority is that
Rebecca Cramer signed a ratification as to her interest in favor
of Pace on June 27, 2019. PX 44; SF ¶ 99. Pace claims that, when
the ratification was signed by Ms. Cramer, this adversary
proceeding had been pending for some time. So, Pace goes to say,
that it was clear to MOC the extent of Pace's claims, including
claims to Rebecca Cramer's interest.

MOC contends otherwise. Though Stephen Braucht's signature
to the Pace-Olcese Lease Addendum was recorded, he and his
sister, Patricia Braucht, held their interests as joint tenants
with the right of survivorship. Patricia Braucht did not sign
the lease addendum. SF ¶ 92.

MOC goes on to say that Stephen B. Braucht died in 2010
leaving Patricia as the lone surviving joint tenant. Though she
accepted royalties, MOC contends that does not ratify what she
did not own. Thus, MOC concludes the recordation of the addendum
including Stephen Braucht's signature did not affect Patricia
Braucht's rights while Stephen Braucht was alive. Patricia did
own all of the rights until Stephen passed away. So, MOC was not
on inquiry or constructive notice of Pace's priority to the
Rebecca Cramer interest.

Pace's ratification signed by Rebecca Cramer, MOC notes,
was on the same day she signed a Quitclaim, Assignment and Bill
of Sale favoring MOC. SF ¶ 100; JX GGG. It was not until August

---

[14] Ms. Hicks also testified that she knew Pace was the operator of
Section 17, so payment of royalties was not inconsistent with possession of
Section 17. TT 237:19-238:22.

1  2019 that MOC received a copy of the ratification signed by

2  Rebecca Cramer in favor of Pace. By then, MOC had recorded the

3  documents that Ms. Cramer had signed.

4      The court is not persuaded that the signature of Stephen B.

5  Braucht on the Pace-Olcese Lease Addendum put MOC on inquiry

6  notice. California's joint tenancy law does not support Pace's

7  position. Pace argues that when Stephen and Patricia transferred

8  their interest in a portion of Section 17 by mineral deed in

9  2006 to Stephen Braucht and his wife, Sandra Braucht, it

10  terminated the entire joint tenancy. JX BB; SF ¶ 90. Pace argues

11  that the joint tenancy was terminated even as to property not

12  included in the deed.

13      First, there is no evidence of a written agreement signed

14  by all the joint tenants severing the tenancy. *See*, CC § 683.2.

15  Further, CC § 683.2 discusses severance of a joint tenancy

16  interest not "part" of a joint tenancy interest. Stephen B.

17  Braucht's execution of the Pace-Olcese Addendum did not evidence

18  an intent to sever the tenancy because it was only a portion of

19  the interests that were described in the 2006 mineral deed.

20      Second, Pace's authorities are distinguishable. *Re v. Re*,

21  39 Cal. App 4th 91, 96-97, 46 Cal. Rptr. 2d 62, 66-67 (1995)

22  (severance in identified parcels is found when two of the three

23  joint tenants sign grant deeds to one another severing the

24  tenancy with the third joint tenant; third joint tenant has a

25  remaining one-third interest as a tenant in common with the

26  severing joint tenants); *Estate of Blair*, 199 Cal. App. 3rd 161,

27  168, 244 Cal. Rptr. 627, 631 (1988) (reversing trial court

28  finding of a transmutation of joint tenancy property to

community property when one spouse dies during the dissolution proceeding).

In short, neither the Mineral Deed nor the Pace-Olcese Addendum signed by Stephen B. Braucht severed the entirety of the joint tenancy interest.

That said, Pace's interest in the portion of the Braucht owned by Rebecca Cramer is superior and has priority to the interest of MOC.

First, MOC did not acquire the Cramer interest until June 27, 2019. By then, this action was filed, Ms. Hicks' and Mr. Clement's depositions had been taken, and MOC had available records of Pace's royalty payment being made through the Monthly Operating Reports filed by Pace Diversified. TT 233:8-17, 268:1-8, 137:3-138:21, 168:4-169:6.

Though MOC argues that Ms. Hicks was not told about Cramer already having leased the interest, did she ask? TT 224:12-16. In light of the status of this litigation at the time, she should have asked.[15] *See*, CC § 19; *Kabayan*, 190 B.R. at 395; *Beverly Hills National Bank & Trust Co. v. Seres*, 76 Cal. App. 2d at 255, 172 P.2d at 894. Further, even Rebecca Cramer informed Ms. Hicks of her belief that she and her siblings were receiving royalties in January of 2019. PX 85; *First Fid. Thrift & Loan Ass'n.*, 60 Cal. App. 4th at 1443, 71 Cal. Rptr. 2d at 301.

Also, MOC abandoned its earlier claim that Sandra's Braucht's interests were those of the remaining siblings. MOC

---

[15] There was testimony by Mr. Clement and Ms. Hicks that no independent analysis was done on the Cramer interest which seems very late in the process for experienced landmen. TT 232:17-233:1, 233:8-21.

learned later that those interests were vested in Patricia Braucht.

Finally, the ratification signed by Rebecca Cramer dated June 27, 2019, which MOC admits they saw in August 2019, ratifies Pace Diversified as a lessee under the documents with other recordings referenced. PX 44. The ratification document signed by Rebecca Cramer in favor of Pace shows the pending interest was leased, assigned, and ratified by the then current heirs.

In sum, the court finds that Patricia Cramer ratified the lease interest in favor of Pace. The court further finds that MOC had inquiry notice of Ms. Cramer's ratification of Pace's Olcese lease and had MOC pursued investigation of the interest it would have learned of Pace's interest.

## c.

The Solomon interest represents 3.125% of the oil and gas rights involved in the dispute over Section 17. SF ¶¶ 38-41. Pace Diversified assigned its interest to Dark Rock. JX KK; SF ¶ 34.

For our purposes here, the interest traces back to Jean S. Solomon, the Olcese heir with rights to Section 17. SF ¶¶ 13-16, 38-41. William W. Solomon, Jr. ("Bill")[16] was appointed executor of Jean Solomon's estate on January 30, 1997 and had authority to act under the Independent Administration of Estates Act. JX X. A decree of final distribution was recorded on April 16, 2013. *Id.*

---

[16] References to Mr. Solomon as "Bill" is used to simplify the narrative. No disrespect is intended.

Pace contends it relied on Bill having authority and holding himself out to be the executor and personal representative for the Jean Solomon estate. TT 83:5-16, 83:26-18, 86:27-87:3. Pace Western (Pace's predecessor) sent Bill a signature page for the original Olcese lease which was returned to Pace Western signed in Bill's capacity as executor. However, the document is neither notarized nor recorded. PX 7, 8. After Pace Western assigned the lease to Pace Diversified, royalties were paid until 2004 when Bill sold an Overriding Royalty interest to Pace.[17] PX 12, 13; SF ¶ 44. Bill signed an assignment of royalty to Pace in his individual capacity and did not state it was on behalf of the Jean Solomon estate. The assignment was recorded July 9, 2012. JX JJ.

When Pace assigned its interests to Dark Rock, the assignment referenced the recordation number of the assignment of royalty that Bill signed. JX KK. There is no dispute that MOC had notice of Bill's assignment to Pace. JX JJ.

Pace further contends that MOC was on inquiry notice because of the pending KC Action when it began to acquire the Solomon interests. Maverick's Ms. Hicks did not inquire whether the Solomon interest was subject to the Olcese lease or whether Bill or his siblings were receiving royalties from Pace. SF ¶ 50. Pace further contends there was no independent title

///

---

[17] An overriding royalty is a share of either production or revenue from production (free of the cost of production) carved out of a lessee's interest under an oil and gas lease. Overriding royalty interests are often used to compensate those who have helped structure a drilling venture. An overriding royalty interest ends when the underlying lease terminates. *Black's Law Dictionary* (10th ed. 2014).

review conducted by Ms. Hicks or Mr. Clement.[18] Pace argues that Mr. Clement had a previous history with Bill Solomon and the Solomon siblings because those parties were receiving royalties from MOC in connection with MOC's operations adjacent to Section 17.

On the other hand, MOC argues that it purchased the Section 17 mineral interests of each of the Solomon siblings and recorded quit claim deeds in December of 2016. SF ¶ 51; JX PP, RR, SS; TT 153:11-154:14. MOC asserts that Mr. Clement claimed in his testimony that at no time before MOC purchased the interests did Mr. Clement have information Pace had leased or purchased the Solomon interests. Mr. Clement went on to testify that ordinarily oil and gas interest holders would mention such issues.[19] TT 149:14-151:20.

MOC argues that the Solomon siblings' signatures on the Pace-Olcese lease was not recorded.

Finally, MOC argues that the assignment of royalty interest differs from a fee interest. So, any documentation in the record dealing with a transfer of a royalty interest would not mean anything to Mr. Clement since it involves something different than the fee interest which was the subject of MOC's purported acquisition. TT 151:21-153:7.

The court finds that Pace's interest in the Solomon heirs' interest has priority over MOC's claims.

///

---

[18] The court has previously discussed these issues in connection with prior interests.

[19] There is some support for Mr. Clement's testimony on this issue since he also testified that Bill inquired why there was interest in royalties concerning the Pace interests.

First, three to four years before MOC started its
acquisition efforts, the Decree of Final Distribution for the
Jean S. Solomon estate was recorded. That decree set forth that
Bill was the executor, and that the estate was administered
under the Independent Administration of Estates Act. Therefore,
transactions Bill may have entered into did not require court
approval in all cases. It is also not clear from the record when
Bill was discharged as executor. PC §§ 11753, 12250(b), & 12252.

Second, the fact that Bill's signature on the Olcese lease
was unrecorded is somewhat problematic. Except, MOC does not
dispute that Jean Solomon is the Olcese heir from which the
contested Solomon interests arose. The Decree of Final
Distribution was part of the record and critical to trace the
resulting interest holders.

Third, Mr. Clement's testimony and evidence related to his
communications with Bill indicate MOC may have been on actual
notice of Pace's interests in the Solomon mineral rights in
Section 17 or put MOC on inquiry notice which required further
follow-up. Notably, MOC's deeds contained language giving MOC
the right to collect past royalties owed. MOC then knew of
Pace's interests and contracted to collect past royalties owed
the Solomons. PX 57.

Further proof is Mr. Clement's letter to Bill dated
November 11, 2016. PX 58. It states that the enclosed "agreement
covers your mineral interests in the acreage Pace Diversified
has under lease . . ." *Id.* On its face, Mr. Clement's letter
indicates MOC knew of Pace's interests. A landman with
///

Mr. Clement's experience should know the difference between interests "under lease" and not.

In response, MOC attempts to "walk back" Mr. Clement's statements. At trial, Mr. Clement testified that he did not mean Pace had the contested interests under lease. TT 182:11-183:28. The court finds Mr. Clement's testimony unpersuasive and lacking credibility on that point. Mr. Clement's statement in his letter to Bill is consistent with previous email correspondence with Bill where Clement references the ongoing Pace litigation.

These facts establish MOC's knowledge beyond the record that Pace claimed priority in the Solomon interests. Further inquiry of the Solomon siblings should have confirmed this fact.

Accordingly, the court finds that Pace Diversified and through assignment, Dark Rock's claims to the Solomon interests have priority over the claims of MOC.

**D.**

The Stewart interest is defined as 0.858333% of the oil and gas rights of Section 17.

The parties agree that the oil and gas rights involved with the Stewart interest trace back to Mabel B. Preston. The Decree of Final Distribution for Mabel B. Preston's Estate dated December 13, 1994 and recorded on January 23, 1995, provided that the mineral interests would be divided three ways: (i) one-third to Mabel Preston's daughter, Greta M. Stewart individually; (ii) one-third to Greta M. Stewart as trustee for the benefit of Susan Lynn Thompson (née Stewart) until she reached 40 years of age, then it would vest in Ms. Thompson (she turned 40 on April 3, 2003); (iii) one-third to Greta M. Stewart

as trustee for the benefit of Rosalyn Stewart util Rosalyn reached 40 years of age when it would vest (she turned 40 on December 27, 2005). SF ¶¶ 55-56; JX W.

Pace claims it has priority to the Stewart interest for three reasons. First, Greta M. Stewart signed an addendum to the Olcese lease in September 2004.[20]

Second, Pace claims that notwithstanding the terms of the trust, Greta M. Stewart never conveyed to Susan Lynn Thompson nor Rosalyn Stewart their respective one-third interests. SF ¶¶ 58, 60. Since the interests were never legally conveyed to Susan Lynn Thompson or Rosalyn Stewart, Pace contends that in April 2014 Greta M. Stewart signed a mineral deed granting the entire mineral interest to Pace.[21] PX 19.

Third, Pace repeats the argument that the pending KC Action put MOC on notice of their interest in the entirety of Section 17. Also, Pace repeats that Mr. Clement and Ms. Hicks did not conduct a sufficient inquiry into the interests Pace claims.

MOC claims its interests are superior because an inquiry into the state of record title would not reflect a recorded signature of Greta M. Stewart on either the Olcese Lease Addendum or the 2014 Mineral Deed. Instead, MOC obtained separate Quitclaims, Assignments and Bills of Sale from Greta M. Stewart, a married person, as separate property in November 2016. JX OO. The same form of document was signed by Susan Lynn

///

---

[20] Greta M. Stewart also signed the addendum again in September 2008. These addenda were not recorded. PX 14; SF ¶ 61.

[21] The mineral deed was not recorded. Duane Roach testified that Kern County would not accept the form of notarial acknowledgement on the mineral deed. TT 94:16-95:16, 97:23-98:18.

Thompson in December 2016 and Rosalyn Stewart in January 2017.[22]
JX QQ, TT; SF ¶ 4.

Second, MOC also claims in October 2018 they recorded yet another Quitclaim, Assignment and Bill of Sale signed by Greta Stewart. JX DDD. In this Quitclaim, Greta Stewart acknowledges that she had not previously conveyed to either of her daughters (Susan Lynn Thompson or Rosalyn Stewart) legal title to their beneficial interest in the mineral rights. *Id.*

Third, MOC also claims that neither addendum to the Olcese lease signed by Greta M. Stewart was recorded therefore, there is nothing that an inquiry into the state of title would have revealed to MOC about the interests Pace claims.

Fourth, MOC argues that when Susan Lynn Thompson, Rosalyn Stewart and Greta M. Stewart signed the Quitclaims, Assignments and Bills of Sale in favor of Mineral Acquisition Group, Ms. Thompson and Ms. Stewart had authority to transfer their beneficial interest to Mineral Acquisition Group who then transferred the interests to MOC. So, MOC continues, when the transfers of those interests to Mineral Acquisition Group occurred, the transferors had authority to transfer the legal interest (in the case of Greta M. Stewart) and the beneficial interests (in the cases of Ms. Thompson and Ms. Rosalyn Stewart). Both Susan Lynn Thompson and Rosalyn Stewart had reached the age of 40 by the time their transfers to Mineral Acquisition Group occurred.

---

[22] The actual entity that acquired these interests was another party, Mineral Acquisition Group. It is stipulated between the parties that Mineral Acquisition Group worked with Maverick in negotiating with the Stewart heirs. SF ¶ 4. Mineral Acquisition Group transferred its interests acquired from the Stewart heirs and Greta M. Stewart in June of 2017. JX VV.

1   The courts finds that MOC has priority over Pace as to the
2   Stewart interests.

3       First, there is no dispute that neither Olcese lease
4   addenda containing the signature of Greta M. Stewart was
5   recorded. Nor was the Mineral Deed. The court recognizes that
6   Pace had difficulty recording the Mineral Deed, but that
7   difficulty is not to be weighed against MOC since it was
8   entitled to rely on the state of record title.

9       Second, Pace points to no ambiguity in the record that
10  would put MOC on further inquiry notice concerning Pace's claims
11  to the Stewart interests.

12      Third, though Pace claims that Greta M. Stewart represented
13  that she had authority to transfer all of the Stewart rights
14  before signing the Mineral Deed. TT 100:18-20; PX 17. Actual
15  correspondence from Greta Stewart is ambiguous in that it refers
16  both to her interest and that she was receiving income as a
17  trustee. PX 17. That is consistent with MOC's theory that Susan
18  Lynn Thompson and Rosalyn Stewart's beneficial interests were
19  still held by Greta M. Stewart as trustee.

20      Fourth, when Susan Thompson and Rosalyn Stewart (and Greta
21  M. Stewart) first transferred their mineral interests to Mineral
22  Acquisition Group, the condition to transfer the mineral rights
23  to Ms. Thompson and Ms. Rosalyn Stewart (attainment of age 40)
24  had long since occurred. They could compel Greta Stewart to
25  transfer the interests. *See*, *Milkes v. Smith*, 91 Cal. App. 2d
26  79, 81-82, 204 P.2d 419, 420 (1949).[23]

27  _____

28      [23] MOC relies on *Walgren v. Dolan*, 226 Cal. App. 3d 572, 276 Cal. Rptr.

1    Accordingly, the court finds that since the prior purported

2    transfers of the Stewart interests to Pace were unrecorded, Pace

3    did not hold a prior interest. If MOC was held to inquiry

4    notice, the court finds that inquiry beyond the state of record

5    title was unnecessary. The court has not been provided evidence

6    of an ambiguity in the state of the record or qualification that

7    would suggest that MOC would have any further duty to inquire

8    beyond the record.[24]

9                              **E.**

10    The Simonson/Stanford interests are 6.25% of the oil and

11    gas rights of Section 17. SF ¶¶ 25-26. Pace transferred its

12    interest in these rights to Dark Rock by written assignment. JX

13    KK. The assignment to Dark Rock was recorded on April 30, 2013.

14    The Simonson/Stanford interests trace back to Elsa Simonson

15    who held title to the Simonson/Stanford interests under the June

16    26, 1936 Decree of Partial Distribution of the Estate of Louis

17    V. Olcese. SF ¶¶ 13-16, 25-26; JX G. Doris E. Alexander was the

18    successor trustee of the Elsa A. Simonson Testamentary Trust. JX

19    DD.

20    Pace makes four arguments supporting its position that Pace

21    Diversified and Dark Rock have a priority interest in the

22    ─────────────────────────
554 (1990), in arguing the transferability of the beneficial interest. But in
23    *Walgren*, an *inter vivos* trust was involved and the remaining beneficiary
there had absolute control over the trust property and complete power to
24    direct the trustee to purchase or sell realty. *Id.* at 576, 276 Cal. Rptr. at
556. Those facts are not present here.

25    [24] Pace's arguments that the language in the Quitclaims, Assignments and
Bills of Sale reserving to the grantors the potentially collected unpaid
26    royalty interest put MOC on notice of the interests is unpersuasive
concerning the Stewart interests. There is no dispute that Greta Stewart was
27    the trustee of the Mabel Preston estate, and that Susan Lynn Thompson and
Rosalyn Stewart were beneficiaries. Since those beneficial interests could be
transferred, there is nothing inconsistent in those granting documents
28    containing those provisions.

Simonson/Stanford interests. First, Pace disputes that the grantor of the lease by which MOC claims an interest, Leland Stanford University ("Stanford"), was granted the Simonson interest. The source of dispute is that the final order issued by the Merced County Superior Court settling the account of the Simonson Testamentary Trust directed Ms. Alexander to transfer the balance of the estate including the disputed interests to Stanford.[25] JX DD. Pace also contends that it is undisputed there is no recorded document by which Ms. Alexander as trustee of the Simonson Testamentary Trust transferred the mineral interests to Stanford.[26] SF ¶ 30.

Second, Pace argues that its actions were consistent with the lease relationship between it and Ms. Alexander as trustee. Pace points to the fact that Ms. Alexander signed the Olcese lease with Pace's predecessor, Pace Western Corporation.[27] PX 1. Pace also notes that it paid royalties to Ms. Alexander as trustee until mid-2003 when she no longer accepted them and directed Pace to pay Stanford. PX 3. Mr. Roach testified at trial that he had no reason to believe Ms. Alexander was exceeding her authority by leasing the interests to Pace or her collection of royalty payments.[28] TT 105:24-106:17.

///

---

[25] The Order Settling Account was recorded in June 2007 even though the order was entered nine years earlier. JX DD.

[26] Perplexing as it is for a prestigious, private university with a prestigious law school and, presumably, a well-represented Board of Trustees to rely on unrecorded documents to assert a mineral interest, that issue is not before the court. The court's task here is to determine priority among the litigants. Stanford University is not one of them.

[27] The lease with that signature was never recorded.

[28] It would seem, however, that when Ms. Alexander refused the payments, Pace had reason to question her authority.

Third, Pace contends that other recorded documents in the chain of title put MOC on notice of Pace's lease interest in the Simonson/Stanford interests. Pace claims that the written and recorded assignment to Dark Rock references in its preamble two previously recorded documents.[29] JX KK. The first, was the assignment of the oil and gas lease from the Olcese heirs to Pace Western Corporation. JX Z. The second is the 2004 addendum to the Olcese lease.[30] JX AA.

Pace also points to the substantive provisions of the Dark Rock assignment. It lists several interests. Item 6 is identified as the 6.25% interest at issue here. JX KK. However, the reference to the prerecorded document in the Dark Rock assignment is to the court order appointing Ms. Alexander as trustee. Mineral interests are not mentioned.

Pace relies on *Gates Rubber Company v. Ulman*, 214 Cal. App. 3d. at 365, 262 Cal. Rptr. at 635-36, to argue that this information put MOC on inquiry notice. Therefore, if further study was pursued, MOC would have learned of Pace's claimed interests. But *Gates* does not go as far as Pace claims. There, the Court of Appeal affirmed a trial court finding that a subsequent purchaser had no notice of an unrecorded option to purchase in favor of a lessee. The court noted there was no reference to the unrecorded option to purchase in the recorded documents and the purchaser was allowed to rely on the recorded documents. Here the documents that were referenced in the Dark Rock assignment do not directly relate to mineral interests

[29] MOC admits it knew of the Pace to Dark Rock assignment. SF ¶¶ 33-34.
[30] There is no recorded signature of Doris E. Alexander as trustee on the referenced documents in the preamble of the Dark Rock assignment.

1  except the reference to the assignment of the oil and gas lease

2  to Pace Western Corporation. But it is undisputed that Ms.

3  Alexander's signature is not recorded.

4  　　　Fourth, Pace argues that the pending KC Action and the

5  purported lack of due diligence of Mr. Clement and Ms. Hicks

6  suggest MOC should be found to have had knowledge of Pace's

7  interest. The court has already dealt with those arguments.

8  　　　MOC makes two arguments why it should have priority. First,

9  MOC argues that Ms. Alexander's signature on the Pace-Olcese

10  lease was not recorded. JX Y. So, nothing in the records

11  relating to the Pace-Olcese lease suggests that Ms. Alexander as

12  trustee was a party to the lease.

13  　　　Second, MOC claims that it obtained a lease from Stanford

14  by assignment from Maverick. Maverick obtained the lease from

15  Stanford which was recorded before Pace had a record interest.[31]

16  MOC points to Ms. Hicks' testimony that she contacted Mr.

17  Lindblom at Stanford. Mr. Lindblom previously dealt with Ms.

18  Hicks concerning mineral leases with Stanford. TT 212:7-14,

19  212:20-214:23; DX 628.

20  　　　The court finds that MOC has a prior interest in the

21  Simonson/Stanford interest.

22  　　　First, there is no evidence in the recorded documents that

23  the Pace-Olcese lease or any addenda were recorded with Ms.

24  Alexander's signature as trustee. The Pace-Dark Rock assignment

25  did not contain sufficient information putting MOC on further

26  inquiry notice.

27  

28  　　　　　[31] The Stanford to Maverick lease was recorded January 23, 2017.
Maverick's lease assignment to MOC was recorded June 13, 2017. JX UU, WW.

Second, there are no facts outside the record that were known by MOC that should have led to further inquiry. Mr. Roach testified that in the 2003-2005 timeframe, royalty payments made to Ms. Alexander were uncashed and eventually Pace was told to pay Stanford. PX 4. The parties have stipulated that Pace never paid royalties to Stanford. SF ¶ 32. Though Stanford was, according to Mr. Roach, uncooperative when he inquired that does not change the fact that Stanford never leased any interests to Pace. TT 111:10-112:1.

Even if Ms. Hicks inquired if Stanford was receiving royalty payments from Pace, the response would have been negative. The parties stipulated Pace was not making payments.

Though it is unclear how Stanford obtained title, there is no recorded documentation showing Pace having a prior interest. So as between Pace-Dark Rock and MOC, MOC has priority.

The court therefore finds that Maverick leased the Stanford interest for consideration and did not have notice of Pace's prior undated and unrecorded lease with Ms. Alexander as trustee. Maverick recorded a short form notice of its lease with Stanford in the official records and Maverick assigned the lease to MOC.

**IV**

For the foregoing reasons the court FINDS and DECLARES as follows:

1. MOC has a prior interest in the Black interest in the oil and gas rights of Section 17. The interest has priority over that of Pace Diversified and Dark Rock.

2.   Pace Diversified has a prior interest in the Braucht-Cramer interest in the oil and gas rights of Section 17. The interest has priority over any interest of MacPherson Oil Company.

3.   Pace Diversified, and through assignment Dark Rock, has prior claims to the Solomon interests. Those claims have priority over the claims of MOC.

4.   MOC has a prior interest in the Stewart interest in the oil and gas rights of Section 17. That interest has priority over the interest of Pace Diversified.

5.   MOC has a prior interest in the Simonson/Stanford interest in the oil and gas rights of Section 17. MOC has a priority interest over those claimed by Pace Diversified and Dark Rock.

Counsel for MOC shall prepare a conforming ruling. Counsel for Pace Diversified and Dark Rock shall approve the form of ruling. The ruling shall then be submitted to the court for signature.

IT IS ORDERED that the court will hold a scheduling conference at the Bakersfield session of this court on January 4, 2023, at 11:00 a.m. The parties shall be prepared to discuss further scheduling for the accounting portion of this litigation.

**Dated:** Dec 02, 2022

**By the Court**

René Lastreto II, Judge
**United States Bankruptcy Court**

35

**Instructions to Clerk of Court**
**Service List - Not Part of Order/Judgment**

    The Clerk of Court is instructed to send the Order/Judgment or other court generated document transmitted herewith to the parties below. The Clerk of Court will send the Order via the BNC or, if checked ___, via the U.S. mail.

Brian Becker
550 N Brand Blvd #2100
Glendale, CA 91203-1933

T. Scott Belden
P.O. Box 9129
Bakersfield, CA 93389-9129

Jazmine Flores
5016 California Ave Suite 3
Bakersfield, CA 93309-1649

Donald R. MacPherson
MacPherson Oil Company
100 Wilshire Blvd., Suite 800
Santa Monica, CA 90401

Office of the United States Trustee
2500 Tulare Street, Room 1401
Fresno, CA 93721

Pace Diversified Corporation
13061 Rosedale Highway
Suite G-196
Bakersfield, CA 93314-7612

Jean M. Stroud
1925 G St
Bakersfield, CA 93301-4321

Jerry J. Vathielil
550 N Brand Blvd #2100
Glendale, CA 91203-1933

Grover H. Waldon
1430 Truxtun Ave #900
Bakersfield, CA 93301-5226

Riley C. Walter
265 E River Park Circle #310
Fresno, CA 93720-1580